## DAY v. AMERICAN MACHINIST PRESS.

(Supreme Court, Appellate Division, First Department. July 7, 1903.)

1. MASTER AND SERVANT—UNLAWFUL DISCHARGE—NEGLECT OF BUSINESS—
QUESTIONS FOR JURY.
     In an action by an employé to recover damages for his unlawful dis-charge, the evidence with relation to his absence from headquarters at two different periods during the summer months examined, and *held* to make a question for the jury whether he had willfully or otherwise neglected defendant's business.

2. SAME—VIOLATION OF INSTRUCTIONS.
     The evidence examined, and *held* to make a question for the jury whether plaintiff had willfully violated instructions given him by the defendant.

3. SAME—ESTABLISHMENT OF OTHER OFFICE—DIVERTING MASTER'S MAIL AND CUSTOMERS.

The evidence with relation to plaintiff's having established an independent office, to which he sought to divert defendant's mail and customers, examined, and *held* to make a question for the jury whether it furnished ground for his discharge.

4. SAME—ENGAGING IN COMPETING BUSINESS.

The mere fact that plaintiff had taken steps to obtain a copyright for a new paper, and had engaged in idle talk about the possibility of starting an opposition paper to his master's at some indefinite future time, he not having 'sought financial or other support at the time, could not, as matter of law, be ground for his discharge.

Appeal from Trial Term, New York County.

Action by Clarence P. Day against the American Machinist Press. From a judgment in favor of defendant, entered on a verdict directed by the court, plaintiff appeals. Reversed.

The action is to recover damages for the alleged unlawful discharge of the plaintiff by the defendant on July 27, 1899, in violation of a written contract of employment dated January 11, 1899. Thereby it was agreed between the parties that the plaintiff should "give his services and entire time" to the defendant (and Locomotive Engineering, another paper) "in the business of soliciting advertising, with the title of 'Eastern representative,' * * * the compensation * * * to be 15 per centum of the cash receipts for advertising in that territory in the United States located east of a straight line drawn between Erie, Pa., and Washington, D. C., * * * to be paid as follows: * * * A salary of $150 weekly if that much is due, * * * salary to be charged against the commission above mentioned. * * * If the cash receipts from advertising in the Eastern territory exceeds the sum of $65,000 for the year 1899, that the party of the first part will increase the commission of the party of the second part to 25 per cent. on the excess above the said $65,000. * * * The party of the first part agrees to discontinue all agency business. * * * All excess of earned commissions beyond the weekly salary to be paid * * * on January 2d following each year during life of this agreement. * * * This agreement will go into effect on February 1st, and continue in force indefinitely until changed or discontinued by mutual consent, it being agreed that either party can terminate same by giving sixty days' notice of intention to do so after one year." The complaint alleged that the plaintiff fully and faithfully performed the contract until July 27, 1899, when forbidden and prevented by the defendant from soliciting advertisements in pursuance thereof; the defendant thereafter on August 3, 1899, publishing in its periodical an advertisement as follows: "Notice. Mr. C. P. Day is no longer the Eastern Representative of the American Machinist nor is he in any way connected with it or the American Machinist Press. The name of Mr. Day's successor will be announced in an early issue. All mail intended for the American Machinist should be addressed to 218 William Street, New York. We have no office or representative at 95 Liberty Street."

It is further alleged that since August 1, 1899, the defendant has refused to pay plaintiff's weekly salary, and that the books show receipt since February 1, 1899, from advertisements in the Eastern territory, of $58,000, and the defendant in addition will receive therefrom $32,000, and, if not prevented, the plaintiff would have procured before April 1, 1900, additional advertising with cash receipts of $8,000 or more, and upon said advertising his commissions would amount to $19,500, and he has been paid only $3,600, leaving a balance due him of $15,900.

The answer averred that the plaintiff failed to perform the conditions of the contract, and did not devote his entire time and services as agreed, and while in the defendant's employ neglected its business, contrary to its instructions, and devoted his attention towards establishing a competing newspaper for himself, and set up a separate office, and endeavored to divert its business to him by disparaging its paper, and solicited advertisements for

other publications than the American Machinist and Locomotive Engineering, and by such acts the contract was terminated, and the defendant, on July 27, 1899, so notified the plaintiff, and it paid him in full for all services rendered under said agreement, and since that date the plaintiff has engaged in competing business, and the defendant has, by his breach of the contract, been compelled to employ other persons, incurring an expense and loss of $10,000. By reply the plaintiff denied allegations of the answer, and particularly that he had solicited advertisements for other periodicals, and since July has been engaged in competing business.

At the close of the testimony the defendant moved for a direction of a verdict, which was granted, and thereafter judgment was entered thereon against the plaintiff upon the merits, from which judgment the plaintiff appeals.

Argued before HATCH, PATTERSON, O'BRIEN, INGRAHAM, and McLAUGHLIN, JJ.

Roger Foster, for appellant.

Charles E. Hughes, for respondent.

O'BRIEN, J. The defendant's right to discharge the plaintiff summarily is placed upon four grounds: First, that the plaintiff willfully neglected the defendant's business; second, that he disobeyed the reasonable instructions of the defendant; third, that in violation of his contract, and without the knowledge and consent of the defendant, he established a separate office, to which he sought to divert the defendant's mail and customers; and, fourth, that he attempted to engage in a competing business on his own account, and to that end took steps to establish an independent newspaper.

In examining the sufficiency of these grounds it is important, as throwing light upon the weight to be attached to the acts complained of, to briefly review the relation of the parties at the time of the alleged breach. The particular employment under which the plaintiff was acting when discharged was pursuant to a written agreement dated January 11, 1899, by which the plaintiff was continued in the same work in which he had been engaged for the previous three years as solicitor of advertisements under the title of "Eastern representative." It appears that as far back as 1887 Mr. Hill, now defendant's president, was engaged in publishing a periodical named "Locomotive Engineering," in which venture he was in 1891 joined by Mr. Sinclair. In 1896 they added another publication known as "The American Machinist," and at this time the plaintiff was employed by them as solicitor for both magazines. In 1887 Mr. Hill and Mr. Sinclair separated, the former continuing the publication of the American Machinist and the latter Locomotive Engineering, and the plaintiff was continued as solicitor of advertisements for both down to and after the time that the contract here involved was made. The plaintiff was thus working for two employers, his territory including several states with many large cities. He became well known in the trade, and was very successful in his work of soliciting advertisements. In addition to a large acquaintance with those who would be likely to need the service of the papers in advertising, the plaintiff had systematized his work by making a card index of his customers, and in other ways he aided largely in developing what was a small into a large advertising business. In this work he was nec-

essarily given considerable latitude and freedom, what was expected
of him being that he should produce successful results. That this
was the plaintiff's notion appears from one of his letters sent to Mr.
Hill, wherein he says:

"I am still working as heretofore on the basis of net results. A year's
work during a year. I can and have done far more work in ten months than
the average man does in twelve working full time day in and day out. Fif-
teen years experience has taught me that it doesn't pay to pursue advertising
in the summer time. * * * The advertisers want to be left alone."

Without, however, quoting at length from the correspondence or
the testimony, it is made to appear that, although in terms the con-
tract provided that the plaintiff was to give his "entire time" to the
defendant's business, it was understood that he was at liberty to give
some portion of it to soliciting for the other publication, Locomotive
Engineering, and that in the details of his work considerable free-
dom, latitude, and discretion were vested in him. Moreover, not
alone from the nature of his employment, but also from the fact that
he was to receive $150 a week out of commissions earned, and the
balance due him for commissions should be paid him at the begin-
ning of the following year, is it made to appear that this was not
the ordinary employment of one who is taken into a business, and,
under the direct instruction and guidance of his employer, is expected
to work from day to day during regular hours. That the defendant
profited largely from the plaintiff's work appears from the fact that
in the territory committed to his charge he had increased its adver-
tising so that during the very period of the contract now under con-
sideration his work was yielding better results than it had during
any prior period of his employment. He made his headquarters in
New York City, but his duties required that he should be constantly
visiting various localities, and in determining the places to be visited
he was largely allowed to exercise his own discretion. Before May
1, 1899, his home was in Yonkers, but at that time he moved his fam-
ily to Nantucket for the summer. Just prior to such removal—but
at what exact date and from what cause, beyond the statement at-
tributed to the plaintiff that it was on account of a quarrel between
their wives, does not appear—ill will grew up between the plaintiff
and Mr. Hill, the defendant's president. Pleasant relations having
been destroyed, it appears, according to the plaintiff's testimony, that
he was deprived of office facilities with the American Machinist, his
personal mail was wrongfully opened, and he was discredited with
his customers, and this ill feeling continued to an extent that in April
and May there was, Mr. Hill admits, "friction" and "unpleasantness,"
and he indulged in more or less criticism of the plaintiff to cus-
tomers. The effect on the plaintiff was to cause him to be dissatis-
fied, as appears from the testimony of Mr. Hill, who says that in
the spring of that year the plaintiff had spoken with a customer of
unpleasantness existing between Mr. Hill and himself, which would
probably lead to his leaving the paper at the end of the year, and he
expected to be able to start a new paper on kindred lines. This un-
pleasantness, it further appears, from the correspondence, had culmi-
ated in the plaintiff's writing to Mr. Hill on May 3, 1899, that he

proposed to carry out his contract for the year, but at the end of the period for which his services were contracted his position might be considered vacant.

In the light of this brief summary of the former pleasant and subsequently strained relations of the parties, we may proceed to an examination of the four causes assigned as reasons for the plaintiff's discharge during the latter part of July, 1899. The evidence bearing upon these causes, outside of the correspondence, rests mainly upon the testimony of the plaintiff and Mr. Hill, and for the most part does not present serious contradiction. The first cause assigned for the discharge by the defendant is that the plaintiff willfully and in violation of his contract neglected the defendant's business. In this connection the defendant points out that the plaintiff was absent at Fortress Monroe from June 10 to 20, 1899, and at Nantucket between May 1 and July 21, 1899, instead of attending actively to business. It is conceded, however, that the plaintiff's absence at Fortress Monroe was to enable him to attend a convention of railway master mechanics and car builders, and was with the knowledge of the defendant, and in the interests of Locomotive Engineering, and that his visit there in 1899 was but a continuation of his visits in prior years to a similar convention. This, therefore, may be dismissed from serious consideration.

The second branch of the charge relates to the plaintiff's absence at Nantucket, where his family had gone for the summer, and according to the defendant's figures he was there 23 out of 82 days between May 1st and July 21st. It does not appear, however, that in this figuring any account was taken of Sundays and holidays, of which there were about 14 during that period, and no credit is given for work done there in correspondence or in keeping up the card index. It is true that the plaintiff wrote from Nantucket that he intended to take a long vacation, but the testimony shows that he was not, during the few days that he personally remained there, idle; but what he in fact did was to use Nantucket as a center, and during the time visited customers in Connecticut, Boston, and other New England points, and with respect thereto he furnished an account of the times and the number of such visits. It does not appear that any damage resulted to the defendant from the few days which during the summer the plaintiff actually spent at Nantucket with his family, and, unless the contract is susceptible of a construction—which we do not think it is—that the plaintiff was bound to be in the city of New York every day during the period of his employment, or could not absent himself or visit different places and other customers without the express assent or direction of the defendant, there was a question of fact as to whether plaintiff's conduct constituted willful or any neglect of the defendant's business.

The second cause assigned is the failure to obey the reasonable instructions of the defendant. The testimony bearing upon this subject shows that in two instances instructions were sent him which it is claimed he was remiss in failing to carry out. The first is with respect to obtaining an advertisement from the Ferrachute Machine Company, whose office was at Bridgeton, N. J., about which the de-

fendant on June 19th, while plaintiff was about leaving the wharf at Old Point Comfort on his way from the convention at Fortress Monroe to New York, telegraphed him: "Ferrachute Machine Company want quotation on two-inch double column space." The plaintiff did not go directly to Bridgeton, and when later he started he was told not to go, and in excuse for his not going immediately he says that he had been in communication with that company, and knew just what they wanted, gave them rates by mail at once, and told them he would be down. He further testified that he continued on his way to New York, and reported at the defendant's office, and then went to Connecticut and to Boston. On June 20th, it appears, the defendant wrote plaintiff at Nantucket, "Immediately after the fourth we want you to see Ferrachute Machine Co.," and on July 7th Mr. Hill replied to a letter from plaintiff by saying that the Ferrachute Company had sent in a small advertisement, whereas competitors had secured a larger contract. The second instance cited by the respondent was the plaintiff's failure to see the Hendey Machine Company at Torrington, Conn. In the letter of June 20th (which plaintiff says he did not receive till his return from Boston after July 1st) Mr. Hill wrote, "Go and see Hendey at once, and report." Just what had occurred prior to this is not entirely clear, but it appears that the Hendey Company had canceled their contract, of which the plaintiff was aware, and he says that he delayed attending to the matter because he had no data as to why they had done so, and wished to know the situation, and he wrote to the secretary, who was a personal friend, and who replied July 1st that no reason was given, and that what they did not care to commit to paper could be said briefly. On July 5th the plaintiff went to Torrington, and succeeded in getting the desired contract. Thereafter he continued to other places and obtained other contracts for the defendant up to and including July 25, 1899.

We do not think it can be said as matter of law that plaintiff's acts constituted willful violations of instructions. He did not refuse to obey, but merely used his own judgment as to the manner of carrying out the instructions. Considering the nature of the contract and the character of the employment, although it was the duty of the plaintiff to obey any orders or instructions given him, it was shown by the course of conduct between the parties that he was permitted to exercise some latitude and discretion in working out the details. Though there was not an instantaneous response by the plaintiff to the directions, upon the evidence it was a question of fact as to whether or not he was acting within the limits of the discretion conferred upon him. It further appears, however, that such conduct was not seriously considered by the defendant, or relied upon in his subsequent discharge, and we need not, therefore, pursue the subject further.

The third ground is that the plaintiff established an office at 95 Liberty street, New York City, to which he sought to divert the defendant's mail and customers. It is conceded that the office was established May 1, 1899, nearly three months prior to the plaintiff's discharge. It was done openly, and was fully known to the defend-

ant, as shown by the plaintiff's testimony, and by the fact that Mr. Hill received from that office the letter of May 3d, in which the plaintiff signified his desire to resign at the close of the year. No objection, so far as appears, was ever made to the use of this office. It is now insisted that, as the plaintiff set himself up as an "advertising counselor," which was different than "Eastern representative," he was entering a new business. These words, however, were not only on the plaintiff's office door, but on the letter heading which Mr. Hill received; and the plaintiff's testimony is that he was thus endeavoring to forward the defendant's paper by getting better acquainted with the customers and assisting them in their advertising. It was not proved, and plaintiff denied, that he received any pay from or secured any work for a competitor. The additional reason which he gives for establishing the office is that he required a place for his papers, and, as his family had removed from Yonkers, and the defendant had declined to permit him any longer to have a desk in its office, he concluded to have a separate office down in the manufacturing center and adjoining his other employer, Locomotive Engineering, with whom in previous years he had had an office. With respect to diverting mail and enticing customers to leave the defendant, the plaintiff makes a positive denial, and all the evidence we have to the contrary is that some few letters for the American Machinist found their way to the office of its Eastern representative. Nothing was presented on this subject, therefore, which, as matter of law, would justify the defendant in discharging the plaintiff; and, viewed in the light most favorable to the defendant, there was a question for the jury.

The respondent's final ground is that the plaintiff undertook to engage in a competitive business on his own account, and in that connection took steps to establish an independent newspaper. This, as will be seen from an examination of what occurred when the plaintiff was dismissed, was the real ground relied upon. The plaintiff, after receiving a letter dated July 7th from Mr. Hill, intimating that he hasten his resignation, went to New York, and had an interview with him, and suggested that, inasmuch as there seemed to be friction, and it was not desired to continue the relationship, he would be glad to settle on any fair and equitable basis at that time, and said that he had received encouragement from friends in regard to starting a new paper, although he had no intention of doing so unless forced to, in which case that would be his logical course. Nothing was then done, but on July 21st the defendant wrote to plaintiff, saying he had broken his agreement by his scheme to start another paper, and that the time to part company had arrived, and that a settlement strictly in accord with the agreement would be made up to date, if desired. The plaintiff declined to accept a settlement on this basis, and thereafter the notice set forth in the complaint was published by the defendant in its periodical. On April 4, 1899, the plaintiff had filed an application for a copyright at Washington for an engineering paper called "Mechanical Engineering," of which, until the fall of 1899, the defendant knew nothing. He had not, however, sought any financial support, or taken any further action. And as for the application, the

plaintiff testified that he desired merely to learn if that name, "Mechanical Engineering," was pre-empted, and the Washington office affords no facilities for a search, and that he put in the words "Vol. 1, No. 1, October, 1899," simply to have a date within the year. There was, however, nothing in this which injured defendant's business, or constituted, as matter of law, a ground for the plaintiff's discharge. The fact seems to be that because of criticism and friction that antedated any of the acts alleged to be violations of the contract the plaintiff was warned to look for future work elsewhere, and that what he did was not of such a positive and competitive nature as to be a breach of his contract of employment. His work during all the period is admitted to show good results, and it was after his letter of May 3d, stating that he wished at the end of the year to terminate his contract, that the criticism and friction increased, and the attitude of the defendant became entirely different from what it had been in prior years. We think that what undoubtedly affected the temper and controlled the action of the president of the company was the knowledge which was brought to him through the plaintiff's letter expressing the intention to discontinue his services at the end of the year, and the feeling that he would employ the intervening time to his own advantage, rather than for the benefit of the company. Such a feeling, however, would not justify the plaintiff's dismissal, unless it appeared—which we do not think it did—that he was using the time which he should have given to the company's business in furthering his own interests. We agree with the respondent that, although it had no knowledge of what the plaintiff had done with reference to obtaining a copyright of a paper at the time of his dismissal, this act, coupled with evidence that what he had done was necessarily prejudicial to the business, or had taken up time that should have been devoted to the defendant's business, or had resulted in the establishment of a paper which had been in competition with the defendant's paper, would have been sufficient to sustain such dismissal. We do not think, however, that taking steps to obtain a copyright or engaging in idle talk about the possibility of starting an opposition paper at some indefinite future time without seeking financial or other support in such a prospective enterprise would, as matter of law, be ground for discharge.

As we have endeavored to point out, we do not think that any or all of the grounds, taken together or separately, as they appear in this record, were sufficient, as matter of law, to warrant his discharge. But if a jury should find that there was bad faith of the plaintiff, or willful refusal to obey proper instructions, or a course of conduct injurious to the defendant's business, they might conclude that the discharge was justified.

Our conclusion, therefore, is that the case should have gone to the jury, and that the judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.